

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 24, 2026**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | § § § § § § § | **CASE NO. 23-30035 (CHAPTER 7)** |
| **ANIMO SERVICES, LLC,** | | |
| **Debtor.** | | |
| **AREYA HOLDER AURZADA, TRUSTEE,** | § § § § § | **ADVERSARY NO. 25-03022-mvl** |
| **Plaintiff** | § | **Related to ECF No. 26** |
| **v.** | § § § | |
| **ENDURANCE ADVISORY PARTNERS, LLC,** | § § § | |
| **Defendant.** | § § § | |

**<u>MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS</u>**

1

## I.    INTRODUCTION

Before the Court is the *Motion to Dismiss Plaintiff's First Amended Complaint* and *Brief in Support* (collectively, the "**Motion**") filed by Defendant Endurance Advisory Partners, LLC ("**Endurance**" or the "**Defendant**") on November 14, 2025.[1] Through the Motion, Endurance seeks to dismiss the *Plaintiff's First Amended Complaint* (the "**Amended Complaint**") filed on October 21, 2025, by Areya Holder Aurzada—the duly appointed Chapter 7 trustee for Animo Services, LLC (the "**Debtor**" or "**Animo**") in the underlying bankruptcy proceeding (the "**Trustee**").[2]

On February 3, 2026, the Court held a hearing on the Motion. Counsel appeared for the Defendant and the Trustee. After considering the issues presented, the applicable case law, and the briefing and oral arguments of counsel, the Court concludes that the Motion should be DENIED, as more particularly detailed hereinafter.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), and this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

When reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "**Rules**"), incorporated by Rule 7012(b) of the Federal Rule of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Court may allow dismissal of a complaint that "fails 'to state a claim upon which relief can be granted.'"[3] As established by the Supreme Court of the United States in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*, to withstand a Rule 12(b)(6)

---

[1] ECF No. 35. All ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 25-03022-mvl.

[2] ECF No. 28.

[3] *In re Reagor-Dykes Motors, LP*, Case No. 18-50214, Adv. No. 20-05028, 2021 WL 2546664, *1 (Bankr. N.D. Tex. June 6, 2021).

motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face" under Rule 8(a) pleading standards.[4]

"A claim satisfies the plausibility test 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[5] Although the complaint is not required to provide detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[6]

In reviewing Rule 12(b)(6) motions, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. As the Fifth Circuit has reiterated numerous times, "[b]ecause a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted."[7]

As for claims involving actual fraud, Rule 9(b), incorporated through Bankruptcy Rule 7009, requires a party to "state with particularity the circumstances constituting fraud or mistake."[8] To meet the heightened particularity standard, a plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."[9] In other words, "Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue."[10]

---

[4] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[5] *Reagor-Dykes Motors*, 2021 WL 2546664 at *1.
[6] *Twombly*, 550 U.S. at 555.
[7] *Reagor-Dykes Motors*, 2021 WL 2546664 at *2 (citation omitted).
[8] *In re Cogent Energy Servs., LLC*, Case No. 23-33659, Adv. No. 23-3212, 2024 WL 3770041, at *3 (Bankr. S.D. Tex. Aug. 12, 2024).
[9] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F. 3d 552, 564–65 (5th Cir. 2002)).
[10] *Id.*

The Trustee's Amended Complaint seeks to avoid and recover nearly $800,000 paid by Animo to Endurance during the applicable lookback period. The Trustee alleges multiple claims, including avoidance of an insider preference under Section 547(b) of the Bankruptcy Code and Section 24.006(b) of the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), actual fraudulent transfer and avoidance claims pursuant to Sections 544, 548, and 550 of the Bankruptcy Code and TUFTA § 24.005(a)(1), and constructive fraudulent transfer and avoidance claims under Sections 548(a)(1)(B) and TUFTA § 24.005(a)(2). The following shall constitute the Court's ruling in connection with the Motion.

## II.    FACTUAL BACKGROUND[11]

Taking the allegations in the Amended Complaint as true, the following constitutes a summary of the allegations necessary to decide the Motion.

The Debtor was an affiliate of With Purpose, Inc. ("**WPI**") and operated under the GloriFi brand. GloriFi's mission was to offer consumer financial products such as checking and savings accounts, credit cards, mortgages, brokerage services, and insurance through a proprietary technology platform known as the "Tech Stack," which included a mobile app and website targeted for launch in March 2022.[12]

To build and launch these products, the Debtor engaged Endurance and its CEO, Stephen Curry, who was also believed to be Endurance's sole owner.[13] Curry and Endurance had extensive expertise in banking, technology, regulatory matters, and digital platforms.[14] On or about August 24, 2021, Curry executed an Executive Employment Agreement with the Debtor and served on its

---

[11] For purposes of this Order, the factual background is based upon the facts contained in the Amended Complaint, which the Court accepts as true for purposes of the Motion in accordance with established authority.
[12] ECF No. 28 at 4.
[13] *Id.*
[14] *Id.* at 4–5.

management team, at times as CEO.[15] While employed by the Debtor, Curry also signed a Master

Services Agreement ("**MSA**") between the Debtor and Endurance on September 6, 2021.[16] Under

the MSA, Endurance was to assist with app and website development, mortgage and deposit

platforms, banking support, and compliance infrastructure.[17] The Debtor agreed to pay Endurance

up to $450,000 at $235 per hour from August 2021 through January 1, 2022.[18]

The MSA contemplated embedding six senior Endurance employees within the Debtor.[19]

These individuals were given decision-making authority over strategy, budgets, vendor selection,

and staffing for critical workstreams, including bank acquisition and regulatory approvals, the

banking and mortgage layers of the Tech Stack, deposit infrastructure, finance, and compliance.[20]

Endurance also acted as gatekeeper to numerous third-party vendors such as Oracle, Finxact,

Blend, Alloy, Verafin, LexisNexis, CAPCO, Black Knight, and KPMG.[21] Endurance employees,

using GloriFi email accounts, served as primary points of contact and controlled whether invoices

were reviewed, disputed, and submitted for payment.[22]

The Debtor had no revenue through early 2022 and faced consistent cash shortfalls. Internal

statements circulated between October and December 2021 and during the first quarter of 2022

reflected substantial losses, liabilities exceeding assets for both the Debtor and WPI, heavy accrued

payables to vendors, and reliance on WPI cash infusions, even as WPI itself showed signs of

financial troubles.[23]

---

[15] *Id.* at 5.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 5–11.
[21] *Id.* at 11–12.
[22] *Id.*
[23] *Id.* at 13–28.

From September 2021 through June 2022, the Debtor paid nine (9) Endurance invoices, often promptly:[24]

- September 13, 2021: $68,267.50

- October 18, 2021: $246,891.00

- November 22, 2021: $135,957.93

- December 17, 2021: $74,419.43

- January 21, 2022: $60,229.29

- February 22, 2022: $80,413.61

- April 8, 2022: $81,425.75

- April 29, 2022: $51,132.72

- June 2, 2022: $680.30

In 2021 alone, the Debtor paid $525,535.86 to Endurance, exceeding the MSA cap by $75,535.86.[25] In total, the Debtor transferred $799,420.53 to Endurance, including $273,884.67 within one year of the petition date.[26] According to the Trustee, these transfers were for less than reasonably equivalent value.[27]

While Endurance's invoices were paid quickly, non-Endurance vendors subject to Endurance's gatekeeping often went unpaid.[28] A September 13, 2022 "Vendor Negotiations" tracker reflected nearly $12 million in unpaid invoices for such vendors, and proofs of claim relative to claims incurred during the timeframe exceed $6.5 million.[29] Despite these payments,

---

[24] *Id.*
[25] *Id.* at 16.
[26] *Id.* at 27.
[27] *Id.* at 28–31.
[28] *Id.* at 12–13, 30–31.
[29] *Id.* at 27–28.

Endurance failed to deliver functional banking products.[30] The launch date slipped from March to April and then to May 2022.[31] Testing in April and May revealed large numbers of unresolved defects that prevented core banking functions, with active defects rising from 44 on April 16th to 183 by May 18th.[32] According to the Trustee, the products provided by Endurance did not function, and the delays and defects caused substantial cost and lost time.[33]

In sum, the Trustee contends that Endurance exercised substantial internal control, prioritized its own payments, failed to deliver functional banking products on schedule, and that Endurance's invoices were paid at the expense of other creditors while the Debtor and WPI were financially vulnerable or insolvent.[34] On that basis, the Debtor seeks avoidance of the transfers.[35]

## III.    LEGAL ANALYSIS

### Count I: Avoidance of 1-Year Transfers as Insider Preferences

Endurance argues in its Motion that the Trustee fails to plead the necessary factual support for its preference claim. Section 547(b) of the Bankruptcy Code allows a trustee to avoid and recover a transfer of the debtor's property if five elements are met. These elements are: (1) the transfer was to or for the benefit of a creditor; (2) it was made on account of an antecedent debt; (3) it occurred while the debtor was insolvent; (4) it was made within 90 days before the bankruptcy filing, or within one year if the creditor was an insider; and (5) it allowed the creditor to receive more than it would have received in a Chapter 7 liquidation had the transfer not occurred.[36] Specifically, Endurance argues that the Trustee failed to plausibly allege that (1)

---

[30] *Id.* at 29.
[31] *Id.*
[32] *Id.* at 29–30.
[33] *See id.* at 29–31.
[34] *See id.* at 11, 13–27, 29–31
[35] *Id.* at 31.
[36] 11 U.S.C § 547(b); *In re Garcia Grain Trading Corp.*, Case No. 23-70028, Adv. No. 23-7002, 2024 WL 3170630, at *9 (Bankr. S.D. Tex. June 24, 2024).

Endurance was an insider of the Debtor and (2) that the Debtor was insolvent at the time of each transfer.

### 1. *Insider Status*

The first issue is whether the Trustee plausibly alleged that Endurance was an insider of the Debtor. The term insider can be characterized in two ways: (i) statutory *per se* insiders; and (ii) nonstatutory insiders that do not deal at arm's length.[37]

Section 101(31) of the Bankruptcy Code provides that insiders of a corporate debtor include: (i) a director of the debtor; (ii) an officer of the debtor; and (iii) a person in control of the debtor.[38] Endurance argues that, as a limited liability company, it could not possibly serve as either a director or an officer of the Debtor such that it could be a statutory insider under § 101(31)(B)(i)–(ii). The Court agrees with this portion of Endurance's argument.

However, whether Endurance qualifies as a "person in control" under subsection (iii) for purposes of statutory insider status is a closer call. "In order to be considered a 'person in control' of a debtor …, the person must have had actual managerial control over the day-to-day operations of the debtor."[39] It is without question that an entity may be a "person".[40] A creditor's ability to influence transactions in which it has a direct interest does not, by itself, constitute the level of "control" required to deem that creditor a "person in control" under the statute.[41] The ability to monitor or exert influence regarding financial transactions at which it has a personal stake is

---

[37] *In re Chapman*, 628 B.R. 512, 524 (Bankr. S.D. Tex. 2021).
[38] 11 U.S.C. § 101(31)(B)(i)–(iii).
[39] *Halperin v. Wills (In re Senior Care Ctrs., LLC)*, Case No. 18-33967, Adv. No. 20-03178, 2023 WL 7137097, at *26 (Bankr. N.D. Tex. Oct. 29, 2023).
[40] 11 U.S.C. 101(41); *WBCMT 2007 C33 Office 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 482 (5th Cir. 2016) ("[A] person includes an individual, partnership, and corporation.") (internal quotations omitted); *In re CorrLine Int'l, LLC*, 516 B.R. 106, 157 n.15 (Bankr. S.D. Tex. 2014) (finding that the definition of "corporation" under 11 U.S.C. § 101(9)(A) includes limited liability companies).
[41] *Halperin*, 2023 WL 7137097 at * 26.

insufficient.[42] For a person to be in control, they must have "actual control"—or its close equivalent.[43]

Endurance cites to *Senior Care Centers, LLC* as support for the proposition that the relevant relationship in analyzing nonstatutory insider status of a transferee is the relationship between the transferee (Endurance) and the debtor transferor (Animo), not the relationship between the transferee (Endurance) and some third party (Curry).[44] *Senior Care Centers* involved three parties: (1) Senior Care Centers; (2) The Neuman Foundation, Inc. (the "**Foundation**"), and (3) Granite— which was an indirect majority owner of Senior Care Centers.[45] The transaction at issue involved a bridge loan between Senior Care Centers and Granite.[46] In that case, the Hon. Stacey G. C. Jernigan rejected the trustee's argument that the Foundation's relationship with Granite, a third-party, was relevant to the insider inquiry.[47] Specifically, the trustee failed to provide evidence of a sufficiently close relationship between the Foundation and Senior Care Centers.[48]

Here, the Trustee's allegations show that Curry was not "some third party." Rather, the Trustee alleges that Curry was the CEO and sole owner of Endurance and, at various points during the relevant period, *the CEO of the Debtor itself*, while the Endurance employees simultaneously held senior leadership positions within the Debtor's organization. Any relationship between Endurance and the Debtor was therefore a direct, bilateral relationship—not an attenuated one mediated through a third party; therefore, the *Senior Care Centers* holding does not foreclose

---

[42] *Id.* (quoting *Schubert v. Lucent Techs Inc. (In re Winstar Comms., Inc.)*, 554 F.3d 382, 396 n.5 (3d Cir. 2009)).

[43] *Id.*

[44] *In re Senior Care Ctrs.*, Case No. 18-33967, Adv. No. 20-03182, 2023 WL 6519756, at *24 (Bankr. N.D. Tex. Mar. 24, 2023).

[45] *See id.* at *1.

[46] *Id.*

[47] *Id.* at *24.

[48] *Id.*

Endurance's role as a "person in control." Again, Endurance's CEO, Curry, acted as the Debtor's CEO.

Regardless, the Court need not, and does not, rest its ruling on statutory insider status alone. Unlike the statutory insider definition, the test for nonstatutory insider status does not require a showing of actual control over the debtor's day-to-day operations.[49] In evaluating nonstatutory insider status, the Fifth Circuit generally "focuses on two factors: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's-length."[50] The key inquiry under the first factor is "whether the relationship is close enough for the alleged insider to gain advantage due to affinity."[51] "An arm's-length transaction is defined as a transaction taking place as if the two parties were strangers."[52] This Court has used certain more specific factors in previous cases to determine nonstatutory insider status.[53] Those factors include whether the alleged insider: (1) attempted to influence decisions made by the debtor; (2) selected new management for the debtor; (3) had special access to the debtor's premises and personnel; (4) had managerial control, including personnel decisions and decisions as to which creditors should be paid; (5) generally acted as a joint venture or prospective partner with the debtor rather than an arm's-length creditor; and (6) whether the relationship between the debtor and the creditor was the result of an arm's-length transaction.[54]

---

[49] *Halperin*, 2023 WL 7137097, at *27.

[50] *In re Essential Fin. Educ. Inc.*, 629 B.R. 401, 430–31 (Bankr. N.D. Tex. 2021) (citing *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992)).

[51] *Id.* (citing *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt., L.P.)*, 604 B.R. 484, 535 (N.D. Tex. 2019) (Fitzwater, J.); *In re Premiere Network Servs.*, 333 B.R. 126, 129 (Bankr. N.D. Tex. 2005) (Hale, J.)).

[52] *Id.*

[53] *Id.*

[54] *Id.* Although the Fifth Circuit has not adopted these factors, the Court nevertheless finds that they are a helpful framework for analyzing Endurance's alleged insider status in this case.

10

Specifically, the Court finds that the following facts alleged in the Amended Complaint provide a reasonable inference with regards to Endurance's alleged insider status:

1. Endurance influenced decisions made by the Debtor by repeatedly directing the CFO and Director of Accounting to pay Endurance invoices immediately and ahead of other vendors, including on occasions when the Debtor's own financial officers had communicated acute cash shortfalls and millions in outstanding vendor obligations.[55]

2. Endurance populated the Debtor's management structure with Curry as the Debtor's CEO and embedded six senior Endurance employees within the Debtor's organizational hierarchy with authority over strategy, budget, vendor selection, and staffing across critical workstreams.[56]

3. Endurance utilized GloriFi email accounts and had direct on-demand access to the Debtor's CFO and Director of Accounting.[57]

4. Endurance had access to the Debtor's internal balance sheets, income statements, and vendor payment records.[58]

5. Endurance personnel were embedded within and functioned as part of the Debtor's internal leadership which allowed Endurance to exercise decision-making authority over the Debtor's own strategic and financial workstreams.[59]

6. Endurance exercised control over which creditors would be paid by serving as a gatekeeper to the non-Endurance vendors while ensuring its own invoices were paid in full and within days of submission.[60]

---

[55] ECF No. 28 at 14–15, 17–18, 24.
[56] See id. at 5–11.
[57] See id. at 11, 14–15.
[58] See id. at 16–17.
[59] See id. at 5–11.
[60] See id. at 11–12, 27.

7.  Curry negotiated the MSA simultaneously as CEO of both the Debtor and Endurance.[61]

8.  Endurance's sole owner and CEO, Curry, finalized the MSA on behalf of the Debtor using his GloriFi email address.[62]

The facts alleged in the Amended Complaint are sufficient to allege an insider relationship. Endurance and Animo were not "strangers."[63] Curry served simultaneously as the CEO and sole owner of Endurance and, at times, as CEO of the Debtor. Endurance served as gatekeeper to third-party vendors under contract with the Debtor, exercising control over whether vendor invoices were reviewed, disputed, or submitted for payment.[64] These allegations, taken as true and viewed in the light most favorable to the Trustee, plausibly support the inference that the relationship between Endurance and the Debtor was not an arm's length commercial engagement but rather one in which Endurance's unique position within the Debtor's operations enabled it to gain advantage by reason of affinity.

The Court therefore finds that the Trustee has plausibly alleged that Endurance was an insider of the Debtor for purposes of the one-year preference period under Section 547(b)(4)(B). In sum, the Trustee has plausibly alleged both that Endurance was a statutory and nonstatutory insider of the Debtor.

### 2. Insolvency

For the Trustee to sustain her preference claim under Section 547(b), the Trustee must plausibly allege that the Debtor was insolvent or financially vulnerable at the time of each challenged transfer.[65] Under the Bankruptcy Code, a debtor is insolvent when the sum of its debts

---

[61] *Id.* at 5.
[62] *Id.*
[63] *See In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 431 (Bankr. N.D. Tex. 2021).
[64] *See* ECF No. 28 at 11–12.
[65] *See In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019).

exceeds all of its assets at a fair valuation.[66] Endurance argues that the Trustee has failed to adequately plead this element for two principal reasons: first, that the insolvency allegations are conclusory and lack the transaction-specific factual support required to tie Animo's financial condition to the timing of each individual transfer; and second, that the Trustee improperly conflates Animo's financial condition with that of its parent, WPI, and other GloriFi affiliates. The Trustee responds that the Amended Complaint provides a detailed contemporaneous financial picture of Animo at the time of each transfer, including specific balance sheet data, internal financial communications, and asset-to-liability comparisons sufficient to plausibly establish insolvency or financial vulnerability throughout the relevant period.

Endurance argues that the Trustee must tie the timing of Animo's insolvency to the timing of each specific transfer and that general or aggregate insolvency allegations are insufficient for this purpose. The Court agrees with the legal principle. The relevant question under Section 547(b)(3) is whether the debtor was insolvent as of the date of each payment at issue. Essentially, "[a] plaintiff plausibly alleges insolvency with 'specific reference to [the transferor's] financial condition at the time' of the transfer."[67] However, insolvency allegations need not be exhaustive at the motion to dismiss stage so long as they provide a plausible factual basis—grounded in financial information tied to the relevant time period—for the conclusion that the debtor was insolvent at or near the time of each alleged transfer.[68] Insolvency is moreover a factual determination generally not appropriate for resolution on a motion to dismiss.[69]

---

[66] 11 U.S.C. § 101(32)(A).
[67] *In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022) (citing *Tow v. Bulmahn (In re ATP Oil & Gas Corp.)*, 711 F. App'x 216, 223 (5th Cir. 2017)).
[68] *See In re Think3, Inc.*, 529 B.R. 147, 200–01 (Bankr. W.D. Tex. 2015).
[69] *In re DSBI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011).

The Amended Complaint, however, does more than recite insolvency in the abstract. It provides a granular, chronological account of Animo's deteriorating financial condition throughout the ten-month period during which the transfers were made, with specific financial data points timed in close proximity to each individual payment. Within weeks of the September 13, 2021 transfer of $68,267.50, Animo was already operating at a net loss of $1,316,275.78 as of October 8, 2021.[70] As of November 20, 2021—two days before the November 22, 2021 transfer of $135,957.93—Animo's balance sheet reflected total liabilities of $1,168,813.00 against total assets of $991,283.00.[71] By early December 2021, Animo required a $3 million cash infusion from WPI to cover basic operating expenses including payroll, and outstanding vendor invoices had reached $3,576,651.48—exceeding the amount of the infusion itself.[72] Eleven days later, on December 17, 2021, Animo paid Endurance $74,419.43.[73] Three days after that transfer, Animo's CFO circulated a year-to-date income statement reflecting a net loss of $9,939,502.00.[74]

The financial picture continued to deteriorate through the remaining transfers. A balance sheet circulated on February 15, 2022—one week before the February 22, 2022 transfer of $80,413.61—showed Animo's liabilities of $4,438,756.10, nearly doubling its assets of $2,380,320.72.[75] By April 5, 2022, Animo's financial condition had become so acute that its founder instructed its CFO to "go back and fight [its] vendor charges"—yet three days later, on April 8, 2022, Animo paid Endurance $81,425.75.[76] By June 2, 2022, the date of the final transfer, Animo's CFO informed its founder that Animo and WPI together owed over $20 million to

---

[70] *See* ECF No. 28 at 13.
[71] *See id.* at 14, 18.
[72] *See id.* at 14.
[73] *See id.* at 15.
[74] *See id.* at 17.
[75] *See id.* at 19–21.
[76] *Id.* at 24.

vendors.[77] These contemporaneous internal communications acknowledging Animo's financial distress are themselves probative of insolvency at the time of the transfers.[78]

These allegations are not general or abstract. They provide a contemporaneous, document-supported financial narrative tied to specific dates in close temporal proximity to each challenged transfer. That is precisely the kind of transaction-specific insolvency the pleading law requires.[79]

Endurance's reliance on *Cyr* is unavailing. In that case, the trustee opposed dismissal with virtually no insolvency facts, relying primarily on the debtor's contemplation of and eventual bankruptcy filing.[80] The Amended Complaint here presents an entirely different evidentiary picture—one grounded in specific financial statement information, internal financial communications, and contemporaneous acknowledgements of financial distress by Animo's own executives and accountants.

Endurance next argues that the Trustee's insolvency narrative improperly conflates Animo's financial condition with that of its parent WPI and other GloriFi affiliates. Because Animo was a distinct legal entity, Endurance argues its insolvency must be assessed independently, and allegations about WPI's financial struggles or the broader GloriFi enterprise's cash burn cannot substitute entity-specific insolvency allegations as to Animo itself.

The Court acknowledges the legal point. Insolvency is an entity-specific inquiry, and a trustee cannot establish a subsidiary's insolvency merely by demonstrating that its parent was in financial distress.[81]While the Amended Complaint does reference WPI's financial condition in several paragraphs, it does so not as a substitute for Animo-specific financial data but rather as

---

[77] *Id.* at 26–27.

[78] *See In re Goodman Networks, Inc.*, Case No. 22-31641, Adv. No. 24-03037, 2025 WL 73072, at *11 (Bankr. N.D. Tex. Jan. 10, 2025).

[79] *See In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022).

[80] *Cyr*, 602 B.R. at 332.

[81] *Neighbors Legacy*, 645 B.R. at 895 (dismissing insolvency allegations that were entirely blanket and undifferentiated across multiple transferor entities).

context for Animo's own deteriorating position. Critically, the insolvency allegations most directly relevant to the transfers are tied to Animo's own balance sheets, Animo's own income statements, Animo's own vendor obligations, and contemporaneous communications by Animo's own financial officers.

Moreover, in the instant case, allegations of WPI's financial instability provide further insight into Animo's financial condition. Where a subsidiary is almost wholly dependent on its parent for funding, and that is already insolvent, or at least financially vulnerable, its fate is near inextricably tied to the financial condition of its parent. And where the parent's financial forecast is teetering on the brink of collapse, it can be inferred that the financial condition of its subsidiaries is unlikely to materially improve, absent evidence to the contrary. This is the exact scenario that the Trustee has alleged.[82]

The November 20, 2021 balance sheet showing Animo's liabilities exceeding its assets, the December income statement reflecting Animo's net loss of nearly $10 million, and the February 2022 balance sheet showing Animo's liabilities nearly doubling its assets are all entity specific financial data points, not affiliate-level generalizations.[83] The fact that the Amended Complaint also references WPI's parallel financial difficulties does not negate the adequacy of the Animo-specific allegations.

The Court notes one additional dimension of the insolvency argument that warrants brief attention. For preference purposes under Section 547(b), the Debtor is presumed insolvent during the ninety days immediately preceding the Petition Date pursuant to Section 547(f). Transfers

---

[82] "As reflected in the income statement, ASL was unable to stand on its own and relief on WPI for its financial stability … WPI, however, was under no obligation to continue to capitalize ASL and had its own cash flow problems." This point is furthered by the allegation that when Animo's CFO sent Curry WPI's balance sheet as of December 20, 2021, it reflected that WPI itself was insolvent. ECF No. 28 at 17.
[83] *Id.* at 17–19.

16

falling within that window therefore carry a presumption of insolvency that the Trustee need not independently plead. However, because the Amended Complaint does not specifically tie each of the one-year transfers to the shorter window, and because Endurance correctly notes that the presumption does not extend beyond ninety days, the Trustee must independently plead insolvency as to transfers falling outside that period. As discussed above, the Court finds she has done so adequately through the contemporaneous financial information and internal communications detailed in the Amended Complaint.

Finally, the Court is mindful that insolvency is generally a factual determination not appropriate for resolution on a motion to dismiss.[84] The Court need not—and does not—find at this stage that Animo was in fact insolvent at the time of each transfer. The Court only finds that the Trustee has plausibly alleged insolvency through specific, contemporaneous financial information sufficient to raise her right to relief above a speculative level. Whether Animo's assets in fact exceeded its liabilities as of any particular transfer date, how intercompany obligations between Animo and WPI should be treated in the insolvency analysis, and what the fair valuation of Animo's assets was at relevant points in time are all questions requiring factual development beyond the pleadings.

Thus, the Trustee has plausibly alleged that Animo was insolvent or financially vulnerable at the time of each challenged transfer. The Amended Complaint provides a granular, chronological account of Animo's deteriorating financial condition supported by specific balance sheet information, internal financial communications, and contemporaneous acknowledgements of distress by Animo's own officers—all timed in close proximity to each individual payment. Endurance's arguments that the insolvency allegations are conclusory and improperly conflate

---

[84] *In re DSBI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011).

17

Animo with its affiliates are not supported by a fair reading of the Amended Complaint.

Accordingly, Endurance's motion to dismiss on insolvency grounds is DENIED.

**Count II: Avoidance of Actual Fraudulent Transfers**

To avoid a transfer as actually fraudulent under Section 548(a)(1)(A) of the Bankruptcy

Code, a trustee must plausibly allege that the debtor made the transfer with actual intent to hinder,

delay, or defraud any entity to which the debtor was or became indebted. 11 U.S.C. § 548(a)(1)(A).

Because direct evidence of a debtor's fraudulent intent is rarely available, courts assess actual

intent by reference to circumstantial "badges of fraud" from which intent may be inferred.[85] The

Fifth Circuit has articulated the following eight badges of fraud in connection with § 548:

> (1) the lack or inadequacy of consideration received by the debtor; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the debtor—both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt by the debtor; (6) onset of financial difficulties by the debtor; (7) pendency or threat of suits by creditors of the debtor; and (8) the general chronology of events and transactions under inquiry.[86]

No single badge is determinative; rather, courts examine the totality of the circumstances, and the

presence of multiple badges of fraud gives rise to a strong inference of fraudulent intent.[87]

Because actual fraudulent transfer claims sound in fraud, they are subject to the heightened

pleading requirements of Rule 9(b), which requires that circumstances constituting the alleged

fraud be pleaded with particularity—satisfying the "who, what, when, where, and how"

comprising the alleged fraud.[88] The particularity requirement therefore applies to the

circumstances of the transfer and is satisfied where the complaint identifies specific facts from

which fraudulent intent can be plausibly inferred.[89]

---

[85] *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 430 (Bankr. N.D. Tex. 2021).
[86] *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008); *In re Think3, Inc.*, 529 B.R. 147, 198 (Bankr. W.D. Tex. 2015).
[87] *Think3*, 529 B.R. at 198.
[88] *Id.* at 197.
[89] *See id.* at 198.

18

Endurance argues that the Trustee has failed to plead actual fraudulent intent with the particularity required by Rule 9(b). Endurance contends that the Amended Complaint relies upon the same generalized factual narrative deployed in support of the Trustee's constructive fraud and preference theories, and that such allegations do not independently satisfy the heightened pleading standard applicable to claims of actual fraud. Endurance further argues that the Amended Complaint identifies no specific fraudulent misrepresentation, scheme, or deceptive act from which this Court could draw a plausible inference of actual intent to hinder, delay, or defraud creditors.

The Court disagrees. The Amended Complaint does not rest its actual fraud theory on abstract and conclusory allegations. Rather, the Trustee pleads a particularized pattern of conduct—including specific dates, amounts, identified actors, and documented operational circumstances—from which the presence of multiple recognized badges of fraud may be inferred.

First, the Court will address directly Endurance's argument that the Trustee's actual fraud theory is directed at the wrong actor—that the Amended Complaint focuses on Endurance's conduct rather than on the Debtor's intent to hinder, delay, or defraud its creditors.[90] A fraudulent transfer claim under § 548(a)(1)(A) examines the *debtor's* actual intent—not the transferee's. The question, then, is whether the Amended Complaint plausibly alleges that the Debtor acted with the requisite intent in making each transfer.

The Court finds that the Amended Complaint does so, and that the answer flows directly from the same dual-role structure that supports the insider analysis in Count I. A corporation is incapable of formulating intent independent of its officers and directors; for purposes of fraudulent

---

[90] *See In re Dual D Health Care Operations, Inc.*, Case No. 17-41320, Adv. No. 20-04059, 2021 WL 3083344, at *14 (Bankr. N.D. Tex. July 21, 2021) ("To succeed on a claim for the avoidance of an actual fraudulent transfer, … a plaintiff must establish that the debtor transferor intended to hinder, delay, or defraud its creditors in making the transfer, not that the recipient transferees intended such outcomes.").

transfer liability, the intent of those officers and directors is properly imputed to the corporate debtor.[91] The Amended Complaint alleges that Curry served as CEO of the Debtor at various points during the relevant period and that he did so while simultaneously serving as CEO and sole owner of Endurance—the transferee.[92] In that capacity, the Debtor's CEO is alleged to have repeatedly directed the Debtor's CFO and Director of Accounting to pay Endurance's invoice promptly—and ahead of other vendors—at times when the Debtor's own financial officers had communicated acute cash constraints and millions in outstanding vendor obligations.[93] On one occasion, Curry submitted Endurance's invoice to the Debtor using his GloriFi email account with a signature block identifying him as CEO of Animo Services, LLC, and then followed up three days later from his Endurance email address demanding payment by the following day.[94] On another occasion, after Curry had received the Debtor's year-to-date income statement reflecting a net loss of nearly $10 million and a balance sheet confirming WPI's liabilities exceeded its net assets, Curry submitted yet another Endurance invoice—and the Debtor's CFO promptly routed it for payment, ensuring Curry knew it had been done.[95] The intent imputed to the Debtor through its CEO in these circumstances is not the generic intent to prefer one creditor over another, which is insufficient under § 548(a)(1)(A).[96] It is rather, the particularized intent of a corporate officer who simultaneously occupied both sides of each transaction—authorizing the payments out of the Debtor's dwindling cash to an entity he controlled, while other creditors whose invoices passed through his own gatekeepers went unpaid. That is precisely the conduct for which the fraudulent

---

[91] *In re James River Coal Co.*, 360 B.R 139, 161 (Bankr. E.D. Va. 2007) ("[T]he fraudulent intent of an officer or director may be imputed to the [debtor] for purposes of recovering an intentional fraudulent transfer."); *see also In re Anchorage Marina, Inc.*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988).
[92] ECF No. 28 at 5.
[93] *See id.* at 14–15, 17–18, 24.
[94] *Id.* at 14–15.
[95] *See id.* at 17, 20–21.
[96] *See In re Fairfield Sentry Ltd.*, 147 F.4th 136, 163 (2d Cir. 2025).

20

transfer laws were enacted, and courts have firmly rejected the argument that a debtor's chief executive can cause the debtor to transfer assets to an entity he owns without any recourse for the estate's creditors.[97]

Here, the trustee plausibly alleges multiple "badges of fraud" in the Amended Complaint. The Court summarizes several of these badges as follows:

### 1. Lack or Inadequacy of Consideration

The Amended Complaint alleges that Endurance was engaged to deliver functional banking products ready for a public launch by March 2022, for a maximum contractual fee of $450,000. Despite receiving $799,420.53—a sum that exceeded the agreed cap by more than $349,000—Endurance delivered no working banking products. By the time testing began in April 2022, active defects in the banking platform rose from 44 on April 16th, to 98 by April 20th, to 169 by May 16th—the day after the final launch deadline—and to 183 by May 18, 2022. Core banking functions, including the basic ability to open checking and savings accounts, could not be completed. The Trustee further alleges that Endurance over-staffed its engagement, over-billed for its services, assigned personnel to duplicative work, and forced repeated last minute strategy changes that compounded the Debtor's inefficiency and cost.[98] The allegation is not simply that the product ultimately failed; it is that Endurance was billing for—and extracting payment from— a dwindling pool of assets during the very period its own performance was falling materially short of the contracted standard. The adequacy of consideration for each transfer is therefore directly tied to Endurance's contemporaneous performance obligations, and the Amended Complaint plausibly alleges its inadequacy throughout the engagement.

### 2. Close Associate Relationship Between the Parties

---

[97] *James River*, 360 B.R. at 161–62.
[98] ECF No. 28 at 29.

As the Court has already determined in connection with Count I, the Trustee has plausibly alleged that Endurance was an insider of the Debtor by reason of Curry's dual role as CEO and sole owner of Endurance and, at times, CEO of the Debtor, and by reason of the Endurance employees embedded in leadership positions within the Debtor's organization.[99] Curry signed the MSA on behalf of the Debtor while simultaneously serving as its CEO and as Endurance's CEO and sole owner.[100] The Endurance employees operated inside the Debtor using GloriFi email accounts, controlled vendor relationships, and exercised decision-making authority over the Debtor's own budget, staffing, and strategy.[101] This operational entanglement constitutes a close associate relationship of significant weight. The insider relationship here is not merely formal; it is operationally substantive. The Trustee alleges that Curry and Endurance controlled the very workstreams on which Endurance was billing and Endurance acted as gatekeeper to the vendors whose invoices competed with Endurance's own for payment from a financially distressed Debtor. This structural self-dealing provides far more particularized factual content than a bare allegation of insider status, and it goes directly to the "who" and "how" that Rule 9(b) demands.[102]

### 3.   *Financial Condition of the Debtor*

As the Court determined in connection with Count I, the Trustee has plausibly alleged that the Debtor was insolvent or financially vulnerable at or near the time of each transfer. Thus, the Court finds support for the presence of this badge at the motion to dismiss stage.

### 4.   *Pattern or Series of Transactions After the Incurring of Debt*

The Amended Complaint does not describe isolated payments; it describes a recurring pattern of conduct sustained across nine months and nine transfers. Each time Endurance submitted

---

[99] *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 535 (N. D. Tex. 2019).
[100] ECF No. 28 at 5.
[101] *See id.* at 6–12.
[102] *See In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 431–32 (Bankr. N.D. Tex. 2021).

an invoice—and sometimes before the prior invoice had been paid—Curry would route it through his GloriFi executive email account, using his CEO signature block, to pressure the Debtor's CFO and Director of Accounting for immediate payment. When a week passed without payment on the December 2021 invoice, Curry escalated from his GloriFi address to his Endurance address, ordering payment by the following day. This pattern repeated across all nine transfers, each time drawing from the Debtor's dwindling cash reserves while the backlog of unpaid non-Endurance vendor invoices continued to grow.[103] Notably, the Amended Complaint alleges that every Endurance invoice was paid within one month of submission, with one paid within seventeen minutes, while non-Endurance vendors subject to Endurance's own gatekeeping authority accumulated nearly $12 million in unpaid invoices.[104] The cumulative effect of this recurring course of conduct—systematically extracting payment from a financially distressed debtor's limited funds in priority over all other creditors—is itself a recognized badge of fraud.[105]

### 5. General Chronology of Events and Transactions

The overall chronology of this case, as set forth in the Amended Complaint, is independently probative of fraudulent intent. Curry executed the Executive Employment Agreement with the Debtor on August 24, 2021, and signed the MSA on behalf of the Debtor just thirteen days later.[106] The first transfer occurred one week after the MSA was signed.[107] From that point forward, each Endurance invoice was submitted and paid within days or weeks, while simultaneously Endurance controlled whether non-Endurance vendors competing for the same limited funds were reviewed, disputed, or paid at all.[108] The final transfer occurred in June 2022,

---

[103] *See* ECF No. 28 at 14, 27.
[104] *Id.* at 27.
[105] *See In re Think3, Inc.*, 529 B.R. 147, 198 (Bankr. W.D. Tex. 2015).
[106] ECF No. 28 at 5.
[107] *Id.* at 13.
[108] *See id.* at 11–12, 27.

by which time the defect count had reached 183 active defects, the banking products were nonfunctional, and the Debtor's CFO had reported that total vendor obligations exceeded $20 million against less than $2 million in available cash.[109] The Debtor was put into involuntary bankruptcy shortly thereafter. Viewed in sequence, the arc of events as alleged—from the self-dealing MSA, through nine months of prioritized insider payments extracted from a Debtor whose insolvency was known to its own CEO, to the complete failure of contracted performance against the backdrop of mounting creditor obligations—presents a chronology from which fraudulent intent may plausibly be inferred.

The particularity requirements of Rule 9(b) are satisfied here. The Amended Complaint identifies, with sufficient specificity, the persons involved (Curry, the Endurance employees, and the Debtor's officers), the nature and mechanism of the challenged conduct (the dual-role, self-dealing, the gatekeeping function, and the prioritization of Endurance's own invoices), the specific transfers at issue (nine identified payments spanning September 2021 through June 2022), and the circumstances from which fraudulent intent may be inferred (insider status, contemporaneous insolvency, over-cap payments, preferential self-dealing, and failure of performance). Together, these allegations plausibly allege actual fraudulent intent and satisfy Rule 9(b)'s "who, what, when, where, and how" requirement.[110]

**Count III: Avoidance of Transfer Under TUFTA § 24.005(a)(1)**

In Count III, the Trustee asserts a parallel claim for actual fraudulent transfer under Section 24.005(a)(1) of TUFTA, which provides that a transfer is voidable as to a creditor if it was made with actual intent to hinder, delay, or defraud any creditor of the debtor.[111] The TUFTA actual fraud

---

[109] *Id.* at 26–27, 30.

[110] *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)).

[111] TEX. BUS. & COM. CODE § 24.005(a)(1).

analysis is substantively identical to the analysis under Section 548(a)(1)(A) of the Bankruptcy Code, and courts within this Circuit regularly apply the same badges-of-fraud framework to both claims.[112] Indeed, Section 24.005(b) of the Texas Business and Commerce Code codifies an enumerated list of badges of fraud that mirrors the common-law factors applied in the federal analysis, expressly including the transfer to an insider, the debtor's insolvency at the time of the transfer, and whether the debtor made the transfer without receiving reasonably equivalent value.[113]

The Court's analysis of Count II applies to Count III. The same particularized allegations— Curry's dual CEO role, the Endurance employees' embedded authority, the gatekeeping mechanism, the preferential payment of Endurance's invoices over those of third-party vendors, the over-cap payments, the contemporaneous insolvency, and the failure of contracted performance—collectively establish multiple badges of fraud under TUFTA § 24.005(b) and are sufficient to plausibly allege actual fraudulent intent under that provision. The Court incorporates its analysis of Count II by reference.

Endurance's Motion to Dismiss Count III is therefore DENIED.

**Counts IV–VI: Avoidance of Constructively Fraudulent Transfers Under § 548(a)(1)(B), TUFTA § 24.005(a)(2), and TUFTA § 24.006(b)**

*1. Reasonably Equivalent Value*

To survive dismissal on the constructive fraudulent transfer claims, the Trustee must plausibly allege that the Debtor received less than reasonably equivalent value in exchange for the challenged transfers.[114] Although reasonably equivalent value is not defined by the Bankruptcy Code, § 24.004(d) of TUFTA defines "reasonably equivalent value" as a "transfer or obligation

---

[112] *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 430 (Bankr. N.D. Tex. 2021).
[113] TEX. BUS. & COM. CODE § 24.005(b)(1), (8), & (9).
[114] *In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002).

that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."[115] Fifth Circuit precedent provides that for "reasonably equivalent value means that the debtor has received value that is substantially comparable to the worth of the transferred property."[116]

Endurance advances two arguments for why the Trustee failed to do so: first, that the Trustee's own pleading admissions establish reasonably equivalent value as a matter of law under the antecedent debt doctrine; and second, that the Trustee's affirmative value allegations are conclusory and impermissibly hindsight-driven. The Court addresses each argument in turn.

### i.   The Antecedent Debt Argument

Endurance's antecedent debt argument rests on a straightforward legal proposition: when a debtor satisfies an antecedent debt and receives a dollar-for-dollar reduction of that liability, it receives reasonably equivalent value by definition.[117] An antecedent debt is a debtor's prepetition obligation owed to the creditor prior to the alleged transfer. Because the Amended Complaint repeatedly acknowledges that the transfers were made on account of antecedent debts owed to Endurance for consulting services rendered under the MSA,[118] Endurance contends that the Trustee has effectively conceded the reasonably equivalent value element and cannot simultaneously maintain that those same transfers were constructively fraudulent.

While this argument has surface appeal, it does not support dismissal at this stage. The Federal Rules expressly authorize a plaintiff to plead alternative and even inconsistent theories of

---

[115] *In re With Purpose, Inc.*, Case No. 23-30246, Adv. No. 24-3038, 2025 WL 1698694, at *21 (Bankr. N.D. Tex. June 16, 2025); TEX. BUS & COM. CODE § 24.004(d).
[116] *Stanley v. U.S. Bank Nat'l Ass'n. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citation omitted) (internal quotations omitted).
[117] *In re Arabella Petroleum Co.*, 647 B.R. 851, 869 (Bankr. W.D. Tex. 2022); *see also* 11 U.S.C. § 548(d)(2)(A).
[118] *See* ECF No. 28 at 27, 31, 37. However, some courts have held that a transfer "made pursuant to the terms of a contract" does not preclude its avoidance as a fraudulent transfer. *See In re Grandparents.com, Inc.*, 614 B.R. 625, 632 (Bankr. S.D. Fla. 2020).

recovery.[119] The Trustee has done precisely that: she alleges the transfers were made on account of antecedent debt for purposes of her preference claim under Count I and, in the alternative, that no reasonably equivalent value was received for purposes of her constructive fraudulent transfer claims in Counts IV–VI. This is a recognized and permissible pleading approach.[120] Whether the antecedent debt concession ultimately forecloses the constructive fraud theory is a merits question not appropriately resolved on a motion to dismiss. At this stage, the Trustee is required only to plead facts that make each theory independently plausible.[121] Thus, the Court declines to require the Trustee to elect between her preference and constructive fraud theories on this basis at the pleading stage.

Endurance's reliance on *Endo Int'l Plc*, does not compel a different result.[122] While *Endo* presented factually analogous circumstances involving a third-party consultant paid under an MSA, the critical distinction is that the trustee in that case did not plead the kind of specific performance failures, operational misconduct, and insider self-dealing alleged here. The persuasive force of *Endo* is therefore limited by the different factual scenario presented in the Amended Complaint.

### ii.    The Pleading Sufficiency and Hindsight Arguments

Endurance next argues that the Trustee's affirmative value allegations are facially insufficient—consisting of nothing more than verbatim assertion, repeated across nine paragraphs, that each transfer "was not made in exchange for Endurance providing reasonably equivalent

---

[119] FED. R. CIV. P. 8(d)(2)–(3).
[120] *See In re CRC Parent Corp.*, Case No. 10-11567, Adv. No. 12-50702, 2013 WL 781603, at *5 (Bankr. D. Del. Mar. 1, 2013) (holding that a trustee who alleges transfers were made in payment of antecedent debt for preference purposes may alternatively allege no consideration was given for the same transfers for fraudulent transfer purposes, and that such alternative pleading sufficiently states a claim for lack of reasonably equivalent value).
[121] *See* FED. R. CIV. P. 8.
[122] 674 B.R. 349 (Bankr. S.D.N.Y. Sept. 29, 2025).

value."[123] Standing alone, such recitation of a statutory element would not survive a motion to dismiss.[124] However, the Court does not read those paragraphs in isolation. The Amended Complaint also alleges, in specific factual detail, that Endurance was retained to develop GloriFi's banking products for a public launch by March 2022 for a maximum fee of $450,000; that Endurance failed to meet this deadline; that Endurance assigned vendors and staff to duplicative work; forced repeated last-minute strategy changes, and over-staffed and over-billed for its services; that the development team was unable to begin testing the banking products until April 2022; and that no working banking products were ever delivered to market.[125] These allegations provide the factual predicate for the no-value conclusion and are sufficient to render the Trustee's constructive fraud claims plausible on their face.

Endurance further argues that these allegations are impermissibly hindsight-driven because reasonably equivalent value must be assessed as of the time of each transfer, not in light of subsequent events.[126] The Court agrees with the legal principle but not its application here. The hindsight prohibition is directed at situations where a transfer exchanged for an asset of demonstrable value is later challenged because that asset subsequently declined in worth—as was the case in both *Topcor*, involving corporate stock backed by land appraised at over $100 million at the time of the transfer, and *Calvillo*, involving real property with a clear appraised value at the time of the transaction.[127] The Trustee's allegations present a materially different question: not whether something of value later lost its worth, but whether Endurance delivered the specific performance it was contracted and paid to provide during the very periods covered by each invoice.

---

[123] *See* ECF No. 28 at 13–15, 18, 21, 24–25, 27.
[124] *In re Reagor-Dykes Motors, LP*, Case No. 18-50241, Adv. No. 20-05028, 2021 WL 2546664, at *1–2 (Bankr. N.D. Tex. June 21, 2021).
[125] *See* ECF No. 28 at 28–30.
[126] *In re Topcor, Inc.*, Case No. 02-10322, 2002 WL 31688702, at *2 (5th Cir. Oct. 28, 2002); *In re Louisiana Pellets, Inc.*, 838 F. Appx. 45, 51 (5th Cir. 2020).
[127] *Topcor*, 2002 WL 31688702, at *2–3; *In re Calvillo*, 263 B.R. 214, 220–21 (W.D. Tex. 2000).

That is a contemporaneous inquiry, not a hindsight one.[128] Whether Endurance in fact delivered reasonably equivalent value for each transfer is factual question the Court cannot resolve on a motion to dismiss.[129]

The Court additionally notes the procedural posture of Endurance's cited authorities. Both *Topcor* and *Calvillo* were decided following a trial or at the summary judgment stage, under standards of review considerably more demanding than the plausibility standard applicable here. The Court declines to resolve at the pleading stage a factual dispute that those courts addressed only after full evidentiary development.

The Trustee has plausibly alleged a lack of reasonably equivalent value sufficient to survive Endurance's Motion. The antecedent debt argument does not require dismissal because the Federal Rules expressly permit alternative pleading of inconsistent theories. The Trustee's substantive allegations, read in the context of the Amended Complaint as a whole, are sufficiently specific to state a plausible claim that the Debtor did not receive reasonably equivalent value in exchange for the transfers. The factual question of whether Endurance delivered value commensurate with its invoices during the relevant periods is not appropriately resolved at this stage of the proceedings.

### 2. *Insolvency or Financial Vulnerability*

The constructive fraudulent transfer claims under § 548(a)(1)(B), TUFTA § 24.005(a)(2), and TUFTA § 24.006(b) require the Trustee to plausibly allege not only a lack of reasonably equivalent value, but also that the debtor was either insolvent or financially vulnerable at the time

---

[128] Any attempt to broadly label the Trustee's allegations as impermissible hindsight that warrants dismissal, lacks a fundamental understanding of the application of Chapter 5 of the Bankruptcy Code. *Aurzada v. Unqork, Inc. (In re Animo Services, LLC)*, Case No. 23-30035, Adv. No. 25-03021, 2026 WL 700426, at *11 (Bankr. N.D. Tex. Mar. 11, 2026) ("All trustees review transactions based on hindsight; Chapter 5 of the Bankruptcy Code statutorily authorizes that level of scrutiny.").

[129] *Matter of Dunham*, 110 F.3d 286, 289 (5th Cir. 1997) (whether fair consideration has been given for a transfer is largely a question of fact as to which considerable latitude must be allowed to the trier of fact).

of the challenged transfers.[130] Financial vulnerability for constructive fraud purposes is broader than the balance sheet insolvency standard applicable to preference claims and encompasses any of the following conditions: (i) the debtor was insolvent at the time of the transfer or became insolvent as a result of it; (ii) the debtor was engaged or about to engage in a business transaction for which any property remaining with the debtor was an unreasonably small capital; or (iii) the debtor intended to incur, or believed it would incur, debts beyond its ability to pay as they matured.[131]

Endurance argues that the Amended Complaint fails to adequately plead this element, contending that the Trustee's financial condition allegations are vague and improperly conflate Animo's condition with that of its parent WPI and the broader GloriFi enterprise.

As discussed, the Court rejected these arguments in the context of Count I. The insolvency and financial vulnerability analysis conducted there applies with equal force here. The Amended Complaint pleads—with granular, chronological specificity—that Animo operated at a net loss of $1,316,275.78 within weeks of the first transfer, that its liabilities exceeded its assets by November 20, 2021, and that its year-to-date net loss had reached $9,939,502 by December 20, 2021.[132] It further alleges that by January 10, 2022, the Debtor's CFO acknowledged to outside accountants that both Animo and WPI would remain in a "no revenue" phase until at least April 2022, and that Animo was pushing forward "with an unreasonably small amount of capital… incurring debts beyond its ability to pay timely."[133] By February 15, 2022, Animo's liabilities of $4,438,756.10 nearly doubled its assets of $2,380,320.72.[134] These allegations are not limited to balance sheet

---

[130] *See In re Goodman Networks, Inc.*, Case No. 22-31641, Adv. No. 24-03037, 2025 WL 73072, at *11 (Bankr. N.D. Tex. Jan. 10, 2025) (quoting *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 120 (5th Cir. 2019)).

[131] 11 U.S.C. § 548(a)(1)(B)(ii)(I)–(III); *see also Life Partners*, 926 F.3d at 120.

[132] *See* ECF No. 28 at 13–14, 17–18.

[133] *Id.* at 17.

[134] *Id.* at 19.

insolvency alone, they also plausibly allege that the Debtor was engaged throughout this period in a capital-intensive technology venture for which its remaining assets were unreasonably small, and that its officers understood the Debtor was incurring vendor and payroll obligations it could not satisfy from operating cash.[135] Each of those conditions independently satisfies the financial vulnerability prong under § 548(a)(1)(B)(ii). The Court further incorporates its ruling on Endurance's entity conflation argument from Count I: the financial data points most directly relevant to the constructive fraud claims are tied to Animo's own balance sheets, income statements, and vendor obligations—not to affiliate-level generalizations.[136]

Accordingly, the Trustee has plausibly alleged financial vulnerability and insolvency sufficient to sustain the constructive fraudulent transfer claims in Counts IV–VI and that the transfers lacked reasonably equivalent value. Endurance's motion to dismiss those counts is therefore DENIED.

**Count VII: Recovery of Voidable Transfers § 550**

In Count VII, the Trustee seeks recovery of the avoided transfers pursuant to Section 550(a) of the Bankruptcy Code. Section 550(a) authorizes a trustee to recover, for the benefit of the estate, the property transferred or its value from the initial transferee or any immediate or mediate transferee of the initial transferee.[137] Recovery under Section 550 is a derivative remedy that is predicated on the successful avoidance of a transfer under another provision of the Code.[138] Because the Trustee's avoidance claims in Counts I–VI have survived Endurance's Motion, Count VII survives as well. Therefore, Endurance's motion to dismiss Count VII is DENIED.

**Count VIII: Disallowance of Claims § 502**

---

[135] *See id.* at 17.
[136] *See In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022).
[137] 11 U.S.C. § 550(a).
[138] *See id.*

In Count VIII, the Trustee seeks disallowance of any proof of claim Endurance has filed or may file against the Debtor's estate, pursuant to Section 502(d) of the Bankruptcy Code. Section 502(d) requires disallowance of any claim held by an entity that is a transferee of an avoidable transfer and has not paid the amount, or turned over any such property, for which such entity is liable.[139] This claim is derivative of the Trustee's avoidance claims and is adequately pleaded to the extent those claims survive.[140] Therefore, Endurance's motion to dismiss Count VIII is DENIED.

**Count IX: Pre-Judgment Interest, Attorneys' Fees, and Expenses**

In Count IX, the Trustee seeks pre-judgment interest, attorneys' fees, and expenses. These requests do not assert an independent cause of action; they are ancillary remedies that flow from the Trustee's successful prosecution of the surviving claims. Whether the Trustee ultimately prevails and the extent of any fee and interest award are matters for a later stage of these proceedings. This request presents no independent basis for dismissal at the pleading stage. Endurance's motion to dismiss Count IX is therefore DENIED.

For the reasons set forth above, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss is DENIED.

### ### END OF ORDER ###

---

[139] 11 U.S.C. § 502(d).
[140] *See id.*